

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EHS:GMR
F. #2023R00272

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 22, 2025

By ECF

The Honorable Eric R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

>   Re:   United States v. Bilal Nagi
>         Criminal Docket No. 23-524 (EK)

Dear Judge Komitee:

The government respectfully submits this letter in advance of the sentencing hearing in the above-referenced case, currently scheduled for August 5, 2025 at 2:30 p.m. On February 6, 2025, the defendant pleaded guilty to kidnapping, in violation of 18 U.S.C. § 1201(a)(1). For the reasons set forth below, the government respectfully requests that the Court impose a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 292 to 365 months' imprisonment to be followed by five years of supervised release and Sex Offender Registration and Notification Act ("SORNA") registration.

I.   Background

   A.   Offense Conduct

The presentence investigation report ("PSR") accurately sets forth the defendant's offense conduct. On March 11, 2023, the defendant, codefendant Ahmed Alaahri, and an unindicted coconspirator ("CC-1") kidnapped and brutally assaulted the victim, then 17-year-old John Doe. PSR ¶¶ 6-7.

Nagi first met John Doe in January 2023 through an acquaintance, CC-1. PSR ¶ 4. CC-1 contacted John Doe and told him to meet him and others at a hotel in Brooklyn. *Id.* When John Doe arrived, he saw CC-1, Nagi, and others inside of a hotel room with cigarettes, marijuana, alcohol, and other items they claimed to have stolen from a store in the Bronx. *Id.* Another person in the room recorded a video which showed Nagi, CC-1, and the merchandise. *Id.* This video was later disseminated, including to John Doe. *Id.* The below screenshot is a portion of this video showing Nagi with some of the merchandise:



After this first meeting, John Doe joined Nagi and others during robberies and thefts in the New York City area. PSR ¶ 5. During one such robbery, John Doe was arrested but the charges were later dismissed. *Id.* Nevertheless, Nagi continued to contact John Doe to enlist his help with other robberies. *Id.*

On March 11, 2023, Nagi contacted John Doe through Instagram and told him that he was coming to John Doe's house in Brooklyn. PSR ¶ 6. Nagi drove a BMW sedan with Alaahri in the front passenger seat and CC-1 in the backseat. *Id.* John Doe entered the BMW, believing he was joining Nagi, Alaahri, and CC-1 to get food. *Id.* Instead, Nagi drove away, Alaahri moved to the back of the car, and Alaahri and CC-1 began punching John Doe in the face. *Id.*

While the initial assault unfolded, Nagi drove the car to Floyd Bennett Field which is located on federal park land in Brooklyn within Gateway National Recreation Area. PSR ¶ 7. Once there, Nagi parked the car and used a cell phone to record the continuing assault as Alaahri restrained John Doe in the back seat. *Id.* During the assault, John Doe's pants were

2

forcibly pulled down and Nagi inserted his fingers into John Doe's anus. *Id.* This sexual assault was both degrading and painful. *Id.* Alaahri subsequently put a knife to John Doe's neck and Nagi threatened him, stating "You're going to let me do whatever I want or we'll kill you." *Id.* Nagi further threatened John Doe, saying "call the police . . . I'll kill you in your house." *Id.* John Doe was also told there was a firearm in the car. *Id.*

Following this assault, the defendants and CC-1 stole John Doe's property, including his phone and money, and then drove John Doe home. PSR ¶ 8. Upon arriving home, John Doe immediately called 911 and reported that he had been kidnapped by three men who robbed him. *Id.* During the call, John Doe identified each person involved by name and said he believed this occurred because he had a video of the men related to the robbery of stores. *Id.* Officers with the New York City Police Department ("NYPD") responded and observed injuries to John Doe's face. John Doe later learned that Nagi had distributed a portion of the video he had recorded showing John Doe being restrained in the back of the BMW with his pants pulled down. *Id.*

On March 23, 2023, Nagi, Alaahri, and CC-1 were all arrested for an unrelated crime, their robbery of a store in the Bronx. PSR ¶ 9. Following their arrests, NYPD officers recovered a firearm from the Mercedes the group used to flee the scene of the robbery. *Id.* Photos of this firearm, both in the car and after it was recovered, are shown below:




Multiple cell phones were also seized from the vehicle. *Id.* ¶ 10. A search of some of these devices, pursuant to a search warrant, showed that they contained a portion of the video recorded by Nagi of John Doe being restrained by Alaahri in the back of the BMW on March 11, 2023. *Id.* Text messages between Nagi and CC-1 from the days before the kidnapping showed that they had discussed setting up John Doe. *Id.*

3

B. Indictment, Arrest and Plea

On December 15, 2023, a grand jury returned an indictment (the "Indictment") charging Nagi and Alaahri with kidnapping, in violation of 18 U.S.C. § 1201(a)(1), assault in the territorial jurisdiction of the United States, in violation of 18 U.S.C. § 113(a)(1), aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a)(1), and sexual abuse, in violation of 18 U.S.C. § 2242(1). On January 11, 2024, Nagi, who was in the custody of the Bureau of Prisons on an unrelated violation of supervised release, was arrested and arraigned on the indictment. Minute Entry (Jan. 11, 2024), ECF No. 12.

On February 6, 2025, the defendant pleaded guilty to Count 1 of the Indictment, kidnapping. Minute Entry (Feb. 6, 2025). On February 23, 2025, the Court accepted the defendant's guilty plea. Order (Feb. 23, 2025).

II. Guidelines Calculation

The Guidelines Calculation, as set forth in the PSR, is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A4.1) | 32 |
| Plus: Dangerous Weapon Used (U.S.S.G. § 2A4.1(b)(3)) | + 2 |
| Plus: Victim Sexually Exploited (U.S.S.G. § 2A4.1(b)(5)) | + 6 |
| Less: Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a), 3E1.1(b)) | - 3 |
| Less: Global Resolution (U.S.S.G. § 5K2.0) | - 1 |
| Total: | <u>36</u> |

PSR ¶¶ 25-35. Based on a total offense level of 36 and a Criminal History Category of V, the applicable Guidelines range for the defendant is 292 months to 365 months imprisonment.[1]

---

[1] The government acknowledges that the parties' plea agreement assumed the defendant would fall within Criminal History Category III. However, the government now understands that although the defendant was sentenced to time served in connection with his prior federal conviction for Hobbs Act robbery, he in fact served 43 months, resulting in additional criminal history points, and he committed the instant offense while on supervised release. Therefore, he properly falls within Criminal History Category V.

*Id.* ¶ 96. The government respectfully submits that the Guidelines calculation set forth in the PSR is accurate and should be adopted by the Court.[2]

III.  Legal Standard

As the Court is aware, the Sentencing Guidelines are advisory and not mandatory. *See United States v. Booker*, 543 U.S. 220, 246 (2005). However, the District Court "must consult those Guidelines and take them into account when sentencing." *Id.* at 264. As the Supreme Court has instructed, courts must "begin all sentencing proceedings by correctly calculating the applicable Guidelines range…[and] the Guidelines range should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Court must also consider the factors specified in 18 U.S.C. § 3553(a) and explain its chosen sentence, including any deviation from the Guidelines range. *United States v. Bonilla*, 618 F.3d 102, 109 (2d Cir. 2010). A sentence should be based on the individual facts of a case and if the Court decides that a sentence outside the Guidelines range is appropriate, the Court must "ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

Although no longer mandatory, the Sentencing Guidelines are an important tool toward achieving the objective of "similar sentences for those who have committed similar crimes in similar ways." *Booker*, 543 U.S. at 252. For that reason, "the Guidelines are not only the starting point for most federal sentencing proceedings but also the lodestar." *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016). Adherence to the Guidelines helps avoid "unwarranted disparities between defendants convicted of similar conduct and with similar criminal backgrounds." *United States v. Elfgeeh*, 515 F.3d 100, 139 (2d Cir. 2008).

After determining the applicable Guidelines range, the Court must turn to the factors set forth in Title 18, United States Code, Section 3553 and "impose a sentence sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a). These considerations include the need for the sentence:

  (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  (B)  to afford adequate deterrence to criminal conduct;

  (C)  to protect the public from further crimes of the defendant; and

  (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

---

[2]  The government agrees with the Department of Probation that the 2021 Guideline Manual should be used to calculate the defendant's Guideline range to avoid any *ex post facto* issue arising from subsequent Guideline amendments. *See* PSR ¶ 24.

5

18 U.S.C. § 3553(a)(2). *See also Booker*, 543 U.S. at 260. In addition to these factors, the Court must also consider the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statements from the United States Sentencing Commission; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. 18 U.S.C. § 3553(a).

IV.  A Guidelines Range Adequately Reflects the Seriousness of the Offense and the Defendant's Prior Criminal History

Considering, among other factors, the seriousness of the defendant's conduct, the defendant's prior criminal history, and the need for general and specific deterrence, the government submits that a custodial sentence within the Guidelines range of 292 to 365 months, is appropriate. As discussed further below, the defendants in this case brutally kidnapped and assaulted the victim. They recorded a portion of the kidnapping on video—which depicted the victim restrained in the back of a car with his pants pulled down and genitals exposed—and this video was later disseminated on the internet. The government respectfully submits that only a sentence that ensures the defendant serves a significant period of incarceration will recognize the seriousness of the defendant's conduct, promote respect for the law, provide adequate deterrence and protect the public, and be sufficient, but not greater than necessary, to achieve the goals of sentencing. *See* 18 U.S.C. § 3553(a).

A. A Departure or Variance is Not Warranted

The defendant's arguments in support of a downward variance, namely that his conduct did not involve sex abuse and that he will be deported upon his release, are unpersuasive. At the time of his plea, the defendant stipulated that John Doe was "sexually exploited" within the meaning of U.S.S.G. § 2A4.1(b)(5). The relevant U.S.S.G. application notes explain that, in this context, "sexually exploited includes offenses set forth in 18 U.S.C. §§ 2241-2244, 2251, and 2421-2423." U.S.S.G. § 2A4.1, App. Note. 3. Overall, these offenses involve the forcible commission of a sexual act, not just mere "sexual contact" as the defendant alleges.

As relevant here, "sexual act" means "the penetration, however slight, of the anal . . . opening of another by a hand or finger . . . with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(2)(C). This definition describes what occurred in this case. Nagi, Alaahri, and CC-1 kidnapped John Doe and then Nagi committed a sexual act, by forcibly inserting his fingers into John Doe's anus. As is understandable in a case of such sensitivity, John Doe—a teenage boy—reported that he was assaulted but was ashamed to disclose the humiliating details of what Nagi had done to him. John Doe did eventually disclose Nagi's actions in meetings with FBI agents and victim advocates.

The defendant's claim at this juncture regarding there being "zero corroboration for the victim's belated allegation," Def. Sent. Memo 2, is an unfortunate continuation of his

6

outrageous actions on March 11, 2023. Nagi assaulted John Doe and then threatened that if John Doe reported the sexual assault, he would kill him. He sought to humiliate and torment John Doe then and his current claim—denying the reality of what occurred—smacks of that same intention.

In any event, Nagi's claim that John Doe's claims are uncorroborated is wrong. Nagi admits—as he must—that video recorded during the kidnapping shows John Doe with his pants pulled down in the back of a car. That video, in which John Doe's genitals are exposed and he has a frightened look on his face, was found on Nagi's phone. The evidence in this case shows that the video was filmed by Nagi. The existence of this video—among the most important pieces of evidence in this case—aligns with John Doe's narrative. Body worn camera video from the New York City Police Department ("NYPD") shows John Doe a short time after the assault with swelling and other injuries to his face. The implication that John Doe, whose account is entirely corroborated by the objective evidence in this case, fabricated a story to the degree suggested by Nagi is baseless.

Similarly, Nagi's additional claim regarding John Doe's potential motive to fabricate a sexual assault is absurd. Nagi claims that John Doe "has a revenge-based motive to fabricate the alleged sexual act" because it could subject Nagi to potential violence upon deportation to Yemen. Def. Sent. Memo 2. He adds that he "has already been subject to threats of violence at MDC Brooklyn" because of the allegations in this case. These allegations, suggesting that John Doe concocted a story involving a sexual assault to place Nagi in danger, attribute to John Doe a level of sophistication and malevolence far beyond what might be expected of a 17-year-old child. In reality, as described above, John Doe's account is corroborated by other independent evidence in this case.

The defendant also directs the Court to the prospect of his deportation to Yemen, what he describes as a difficult childhood in a worn-torn country, and the trauma from which he suffers. Def. Sent. Memo. 3. The government does not doubt that the situation in Yemen, which has been subject to an ongoing civil war, is challenging. However, the defendant had been living in the United States for close to a decade at the time he brutalized John Doe. The difficulties faced by the defendant as a child provide no excuse for his violent conduct as a 30-year-old man. Further, at the time of John Doe's kidnapping, the defendant had already been convicted of multiple violent felonies—including at least two gunpoint robberies—and served several years in state and federal prison. That the defendant now faces possible deportation to Yemen is a circumstance of his own making and the result of his continued victimization of others. It falls far short of a mitigating circumstance warranting a variance.

The cases upon which the defendant relies in seeking a downward variance are inapt for comparison. Although variances were imposed in those cases, the degree of variance was far smaller than the approximately 148-month downward variance the defendant seeks here. Astonishingly, the variance the defendant seeks—148 months—is a longer period of time than his requested sentence of 144 months.

The defendant directs the Court to *United States v. Davila*, 20 cr. 292 (PKC) (S.D.N.Y. 2021), a case in which the defendant confined a criminal associate, naked in a

7

basement, and repeatedly assaulted him. There, the defendant was sentenced to 108 months in prison, a thirteen-month variance from the applicable guidelines range of 121 to 151 months.[3] While the defendant's conduct was egregious, certain aggravating factors present in this case were absent in that matter. For example, there were no allegations that the victim was a minor or that sexual abuse occurred during the course of the kidnapping. In addition, although the defendant had a prior criminal history, it consisted of drug offenses and weapons possession. By contrast, Nagi's prior offenses involve violent gunpoint robberies, and in the instant case he and his co-conspirators targeted a minor.

The defendant's reliance on *United States v. Castillo*, 23-CR-279 (LTS) (S.D.N.Y. 2025), is also misplaced. Although the defendant focuses on a defendant who was sentenced to 84 months, a downward variance from a 168-to-210-month Guidelines range, he neglects to mention a codefendant who received a 124 month sentence (in addition to 21 months of consecutive time on another case for a total of 145 months), representing only a nine month variance from the applicable Guidelines range of 135 to 168 months. As with *Davila*, the facts of *Castillo* did not involve the sexual abuse of a minor. In addition, the defendants' prior criminal histories do not appear to include the level of violence present in Nagi's criminal record.

Similarly, in *United States v. Floyd*, 19-CR-194 (RPK) (E.D.N.Y. 2022), and *United States v. Simons*, 21-CR-009 (CBA) (E.D.N.Y. 2021), the level of violence and abuse inflicted upon the kidnapping victims pales by comparison to what occurred in the present case. The defendants in those cases also do not appear to have the same violent criminal history as Nagi. Those cases are therefore insufficient indictors of the appropriate sentence in this case.

By contrast, in *United States v. Narzikulov*, 19-cr-223 (E.D.N.Y. 2022), a defendant was sentenced to 20 years in prison following his conviction for kidnapping and other offenses.[4] In that case, the defendant and others—who were trying to force their victim to pay money they believed he owed them—forced the victim into a car, drove him to a parking garage and made him strip. After contacting others associated with the victim to try and obtain money, the defendant and coconspirators forced the victim to write out a check. The victim was finally released but the defendants kept some of his property, including his cell phone. Although the offense level and applicable guidelines range was higher in *Narzikulov* than the present case, that case lacked some of the aggravating circumstances present in the instant case and Narzikulov's criminal history level was lower. However, the defendant still received a sentence of 20 years. This suggests that a guidelines range sentence of between 292 to 365 months is appropriate in the present case, where the defendant kidnapped and sexually assaulted a minor.

---

[3] Although the docket entries in *United States v. Davila*, 20-cr-292 (PKC) (S.D.N.Y. 2021) reflect a sentence of 106 months, the judgment, ECF No. 83, reflects a sentence of 108 months.

[4] In addition to kidnapping, Narzikulov was convicted of conspiracy to commit kidnapping, conspiracy to unlawfully produce identification documents, conspiracy to commit Hobbs Act extortion, Hobbs Act extortion, threatening physical violence in furtherance of a plan, and conspiracy to commit witness tampering.

B. <u>The Serious Nature of the Offense and the Need to Promote Respect for the Law</u>

The defendant's conduct in this case was brazen and brutal. Along with two accomplices, the defendant lured the minor victim into a car where he was immediately assaulted. They drove the victim to a park where he was restrained, undressed, and violated when the defendant inserted his fingers into the victim's anus. The defendant's actions were outrageous and depraved. Given the gravity of the defendant's conduct, this is among the most serious cases which will come before this Court. A lengthy period of incarceration is necessary to adequately punish the defendant and signal to the public that such horrifying behavior will not be tolerated.

Further aggravating what was already a crime of appalling cruelty, the defendant recorded a portion of the assault on video and later disseminated part of the recording. A portion of the video was found by law enforcement on multiple electronic devices recovered in this case, including the defendant's cell phone and in an Instagram account. In this video, the victim is shown being restrained by Alaahri in the backseat of a car with his pants pulled down and his genitals exposed. The victim is clearly in distress and being tormented.

The defendant and his accomplices also threatened the victim with further violence. At one point during the assault, Alaahri held a knife to John Doe and the defendant told John Doe that if he contacted the police, he would kill him. John Doe was also told that there was a gun in the car. This was not a baseless threat. Less than two weeks after the victim was kidnapped, the defendant, Alaahri, and their accomplice committed a gunpoint robbery of a store in the Bronx. Following their arrest, a pistol was found in the car they used during the robbery.

The defendant was no stranger to violent criminality and these actions did not occur in a vacuum. The defendant has a history of targeting and victimizing others. His criminal record, discussed more fully below, is marked by violent robberies and drug offenses. Indeed, as referenced above and relevant to this case, the defendant and his two accomplices, Alaahri and CC-1, committed the armed robbery of a store in the Bronx only weeks after kidnapping and brutalizing John Doe.

The defendant's criminal conduct in this case falls within the larger context of an ongoing robbery scheme and his reliance on much younger, impressionable teenagers to orchestrate these crimes. As discussed above, the defendant first met John Doe soon after the defendant and others stole merchandise from a store in the Bronx and were celebrating their criminal conduct. The defendant enlisted John Doe, a minor, in future robberies and John Doe was eventually arrested. CC-1, also a minor, not only participated in the instant kidnapping, but also assisted the defendant in other robberies, including the March 23, 2023 robbery for which the defendant, Alaahri, and CC-1 were arrested. The defendant is over a decade older than CC-1 and John Doe, but regularly associated with them and drew them into a dangerous pattern of criminality. He then violently punished John Doe for perceived transgressions.

The defendant's criminal behavior is egregious, and his actions demonstrate that he does not respect the law. The sentence in this case should show the defendant that his

9

conduct has severe consequences and signal to the public that crimes of such magnitude will be appropriately punished. A sentence within the applicable Guidelines range will accomplish these objectives.

### C. The Need to Deter Similar Conduct

The sentence imposed must also adequately deter criminal conduct. *See* 18 U.S.C. 3553(a)(2)(B). This objective encompasses both specific deterrence, which aims to deter future criminal conduct by the defendant, *see United States v. Bannister*, 786 F. Supp. 2d 617, 661 (E.D.N.Y. 2011), and general deterrence, the need to "prevent criminal behavior by the population at large." *See United States v. Davis*, 82 F.4th 190, 202 (2d Cir. 2023) (citation omitted).

Given the defendant's history of violent crime, as discussed below, and his pattern of reoffending soon after his release from custody, specific deterrence requires the imposition of a substantial sentence. *See United States v. Garcia*, 528 F. App'x 57, 59 (2d Cir. 2013) (affirming an upward variance where the defendant had been engaged in criminality since he was a juvenile); *see also United States v. Lawrence*, 254 F. Supp. 3d 441, 446 (E.D.N.Y. 2017) ("A prison sentence is partly intended to make a community safer and to remove the danger a defendant poses to the people around him . . . after release through specific deterrence."). The Court's sentence should send a message to the defendant that he must "give up crime." *See United States v. Murphy*, No. 24-404-cr, 2025 WL 428420, at *2 (2d Cir. Feb. 7, 2025) (citation omitted).

In terms of general deterrence, the sentence imposed should send a message to others that engaging in the violent conduct at issue here will have serious consequences. *See United States v. LaFord*, No. 11-CR-1032-07 (PAE), 2020 WL 4677595, at *3 (S.D.N.Y. Aug. 12, 2020) (imposing a lengthy sentence to, in part, send a message to others who "commit violence and mayhem" that there will be "serious consequences"). A lengthy sentence is necessary to dissuade others who may engage in similar conduct. The sentence should send a message that crimes which brutalize, degrade and exploit others—especially minors—will not be tolerated.

### D. The Defendant's History and Characteristics

The defendant is a career criminal with a history of committing violent offenses. Prior incarceration has failed to deter his continued victimization of vulnerable members of the community, including in the present case. His prior criminal history—characterized by violent, gunpoint robberies and drug offenses—weighs heavily in favor of a lengthy prison sentence which will ensure that he is incapable of committing further crimes and hurting potential victims.

On December 7, 2018, the defendant was convicted of criminal possession of a controlled substance in the fifth degree, a class D felony, in New York County Supreme Court. PSR ¶ 39. In that case, police officers saw the defendant driving a car and stopped him after he committed a traffic violation. *Id.* The officers found that the defendant's license was suspended, and the car's identification number was obstructed. *Id.* Upon arrest, the defendant was found in

10

possession of 18 bags of the substance khat, a plant which contains the stimulant cathinone. *Id.* Following his conviction, he was sentenced to two years in prison and one year of post-release supervision. *Id.*

On December 10, 2018, the defendant was convicted of attempted robbery in the second degree, a class D violent felony, in Kings County Supreme Court. PSR ¶ 38. In that case, the defendant and an accomplice committed a gunpoint robbery of a store in Brooklyn, New York. *Id.* During the robbery a victim was held at gunpoint and the defendant and accomplice stole over $1,000 worth of property from both the store and the victim's person, including cellphones, cash, and a watch. *Id.* The defendant was sentenced to two years in prison and two years of post-release supervision. *Id.* While incarcerated the defendant committed numerous disciplinary violations and received additional sanctions. *Id.*

Once paroled, the defendant's criminal conduct and disrespect for the justice system continued unabated. PSR ¶ 38. He was arrested again on June 20, 2020—only approximately eight months after being released from prison—and charged with more robberies. *Id.* ¶ 40. In that case—a federal Hobbs Act robbery case in this district—the defendant committed two separate gun point robberies. *Id.* During one robbery, the defendant robbed the victim of 100 ounces of khat. *Id.* On January 19, 2023, he was sentenced to time served (approximately 43 months) which was well below the applicable guidelines range. *Id.* While incarcerated, the defendant regularly committed disciplinary violations for which he was sanctioned. *Id.* These violations included engaging in disruptive conduct, possessing hazardous tools, and being in an unauthorized area of the Metropolitan Detention Center. *Id.*

Upon his release following his Hobbs Act conviction, the defendant failed to report to the Probation Department as required. *Id.* He then committed the instant offense on March 11, 2023, less than two months later. The Probation Department—which was tasked with supervising the defendant—was completely unaware of his whereabouts even after he was arrested for yet another robbery on March 23, 2023.[5] *Id.* He was later arrested by the United States Marshals Service for violating his federal supervised release on or about June 1, 2023. That violation is the subject of a violation of supervised release ("VOSR") pending in this district before the Honorable Ann M. Donnelly, United States District Judge.[6] *See United States v. Nagi*, 21-CR-148 (AMD).

The defendant's repugnant record of violence and his absolute disregard for the law and court orders demand a lengthy sentence of incarceration. The defendant has repeatedly

---

[5] The PSR states that the defendant was arrested by the NYPD on March 23, 2023, and transferred into federal custody on June 1, 2023, pending his violation of supervised release. PSR ¶ 40. This is incorrect. The defendant was released from custody following his March 23, 2023 arrest and later arrested by the United States Marshals Service in June 2023 on a warrant for violating his supervised release.

[6] The defendant is next scheduled to appear in his pending VOSR proceeding on August 6, 2025. *See United States v. Nagi*, 21-CR-148 (AMD), Docket Order (July 10, 2025).

reoffended, especially soon after release from custody. A sentence within the applicable Guidelines range is necessary to account for such a troubling history of lawlessness.

V.  Restitution, Fine, and Forfeiture

In accordance with the Court's individual rules, the government addresses the applicability of restitution, fine, and forfeiture to the instant case. *See* Hon. Eric Komitee, Ind. Rules & Practices in Crim. Cases, VI.A.5. As stated in the PSR, pursuant to 18 U.S.C. § 3663A, restitution is mandatory. However, the government understands that restitution is currently impracticable because the Probation Department has not received an affidavit of loss from the victim and the government will not seek restitution in the absence of additional information regarding loss. The government understands the maximum fine to be imposed is $250,000. *See* 18 U.S.C. § 3571. The parties' plea agreement does not contemplate forfeiture, and the government submits that it is inapplicable in this case.

VI.  The Defendant is Required to Register Under SORNA

The defendant challenges Probation's position, as stated in the PSR, that he must register under SORNA. Def. Sent. Memo 4. He claims he is not a sex offender and is not required to register. *Id.* For the reasons that follow, the defendant is a sex offender, and SORNA is clear that sex offenders "shall register." 34 U.S.C. § 20913(a).

The defendant is a "sex offender" because he was convicted of "a sex offense" as that term is defined under SORNA. *See* 34 U.S.C. § 20911(1). A "sex offense" is, in pertinent part, a "criminal offense that is a specified offense against a minor." *Id.* § 20911(5)(A)(ii). A "'specified offense against a minor' means an offense against a minor that involves . . . an offense . . . involving kidnapping. *Id.* § 20911(7). Here, the defendant pleaded guilty to violating 18 U.S.C. § 1201(a), kidnapping, and the victim, John Doe, was a minor.

Defendant's challenge to his status as a sex offender rests on a faulty premise. He claims he is not a sex offender, arguing he "was not 'convicted of a sex offense' . . . because his offense of conviction does not by its terms have 'an element involving a sexual act or sexual contact with another' and it is not 'a specified offense against a minor." Def. Sent. Memo. 5. He is wrong for two reasons. First, the statute is written in the disjunctive. *See* 34 U.S.C. § 20911(5)(A). One need not be convicted of an offense "that has an element involving a sexual act or sexual contact with another" to be a sex offender. That is just one of five separate definitions for the term "sex offense." *Id.* As relevant here, and as explained above, the defendant's conviction meets the second definition of "sex offense" because he has been convicted of "a criminal offense that is a specified offense against a minor," an offense against a minor that involves kidnapping. *Id.* §§ 20911(5)(A), (7)(A).

The defendant asserts that the Court must apply the categorical approach to determine whether his offense of conviction is SORNA eligible, rather than conduct a factual inquiry, but this claim is unavailing and belied by the statute's language. Under the "categorical approach" a court "may look only to the statutory definitions—*i.e.,* the elements—of a defendant's prior offenses, and *not* to the particular facts underlying those convictions." *See*

12

*Descamps v. United States*, 570 U.S. 254, 261 (quoting *Taylor v. United States*, 495 U.S. 575, 600 (1990)) (emphasis in original). However, SORNA's plain language indicates that the categorical approach is inapplicable in resolving the instant dispute. The term "specified offense against a minor" is clearly defined as including "an offense against a minor that involves . . . kidnapping." *Id.* § 20911(7)(A). Unlike other definitions of "sex offense," this definition makes no reference to the "elements" of the offense of conviction. Under SORNA, one definition of sex offense is "a criminal offense that has an *element* involving a sexual act or sexual conduct with another." *Id.* § 20911(5)(A)(i) (emphasis added). However, as applicable here, a sex offense is also "a criminal offense that is a specified offense against a minor." *Id.* § 20911(5)(A)(ii). The first definition of "sex offense" explicitly references the *elements* of the offense while the second does not. As several appellate courts have recognized in the context of SORNA, the use of the word "element" in a statutory definition implies reliance on the categorical approach while the absence of that word suggests a fact-based inquiry. *See e.g.*, *United States v. Rogers*, 804 F.3d 1233, 1327 (7th Cir. 2015); *United States v. Price*, 777 F.3d 700, 708 (4th Cir. 2015) ("The [Supreme] Court has interpreted the words 'conviction' and 'element' to indicate that Congress meant for the statutory definition to cover a generic offense, implicating the categorical . . . framework[]."); *United States v. Gonzalez-Medina*, 757 F.3d 425, 430 (5th Cir. 2014). In *Rogers*, the Seventh Circuit further explained that although the use of the word "element" suggests the application of the categorical approach, the use of the word "involving" in other parts of SORNA, "implies a noncategorical, fact-based inquiry." 804 F.3d at 1327. This analysis strongly supports the conclusion that in cases implicating the definition of "specified offense against a minor,"—including here, where the language "offense against a minor . . . *involving* kidnapping" is at issue—a fact-based approach applies.

SORNA's legislative history weighs heavily in favor of a fact-based approach in resolving the instant dispute. As defendant concedes, Congress sought to make SORNA's reach "expansive." Def. Sent. Memo. 6. This is a widely accepted observation. *See e.g.*, *United States v. Nazerzadeh*, 73 F.4th 341, 347 (5th Cir. 2023) ("SORNA's language confirms that Congress cast a wide net to ensnare as many offenses against children as possible."); *United States v. Hill*, 820 F.3d 1003, 1005-06 (8th Cir. 2016) (citation omitted) ("Congress enacted the statute to protect children from sex offenders, and it purposely defined its terms broadly to 'cast a wide net to ensnare as many offenses against children as possible.'"). As the Eighth Circuit recognized in *Hill*, "the title of the subsection defining the phrase 'specified offense against a minor' is 'Expansion of definition of specified offense against a minor' to include all offenses by child predators." 820 F.3d at 1006. "These provisions only confirm what the text evidently commands: a circumstance-specific approach." *Id.*

In light of the relevant statutory language and legislative history, it is unsurprising that at least three courts of appeal agree that a fact-based approach—not a categorical approach—applies when determining if an offense is a "specified offense against a minor" and thereby a "sex offense." *See*, *e.g.*, *Price*, 777 F.3d at 708; *United States v. Dodge*, 597 F.3d 1347, 1356 (11th Cir. 2010) ("[W]e hold that courts may employ a noncategorical approach to examine the underlying facts of a defendant's offense, to determine whether a defendant has committed a 'specified offense against a minor' and is thus a 'sex offender' . . . ."); *United States v. Dailey*, 941 F.3d 1183, 1192 (9th Cir. 2019) (holding that the non-categorical approach applies

13

to the question of the age of the victim under the "specified offense against a minor" residual clause).

Tellingly, the defendant concedes that his position is irreconcilably at odds with holdings of those courts of appeal to consider the issue, specifically the Ninth Circuit in *United States v. Mi Kyun Byun*, 539 F.3d 982 (9th Cir. 2008). Def. Sent. Memo. 6. Rather than try to distinguish the instant case from *Byun*, the defendant instead argues that the Ninth Circuit was wrong. This is an untenable position which, as discussed above, has been rejected by at least two other appellate courts. The defendant's attempts to parse the words employed by Congress does little to undermine what is plain from SORNA's language. The statute's plain language states that those offenders convicted of kidnapping, where the victim was a minor, are sex offenders and must register under SORNA.

As the government explained in its response to the defendant's objections to the PSR, in *Byun*, the Ninth Circuit directly addressed the issue and found that a factual approach—not a categorical one—was proper. *Id.* at 993-994. In its discussion, the court addressed under which circumstances a kidnapping would be a "specified offense against a minor," and thus a registerable sex offense. *Id.* at 992. It concluded that "the definition strongly suggests that *any* kidnapping offense becomes a 'specified offense against a minor' when the victim is a minor." *Id.* (emphasis in original). In reaching this conclusion, the court explained, as discussed above, that "Congress did not define 'specified offense against a minor' in terms of elements" and this suggested a fact-based inquiry applied. *Id.*

The defendant pleaded guilty to kidnapping. The person kidnapped was a minor. Therefore, under SORNA, the defendant is a sex offender and must register as one.

VII. Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence within the Guidelines range of 292 to 365 months, to be followed by a five-year term of supervised release and SORNA registration.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Gilbert M. Rein
Assistant U.S. Attorney
(718) 254-6407

cc: James Darrow, Esq., Defense Counsel (by email and ECF)
Nicole Gervase, United States Probation Officer (by email and ECF)